RITER–CONLEY MFG. CO. v. ATLANTA GASLIGHT CO. et al.

(District Court, N. D. Georgia. June 10, 1916.)

No. 56.

1. PATENTS ⊚⇒328—VALIDITY AND INFRINGEMENT—PROCESS OF MANUFACTURING COAL GAS.
The Carpenter & Barnum patent, No. 1,140,113, for a process of manufacturing coal gas, as limited by the prior art and the proceedings in the Patent Office, conceding its validity, *held* not infringed by the use of the apparatus of the Congdon patent, No. 1,090,813.

2. PATENTS ⊚⇒328—VALIDITY AND INFRINGEMENT—APPARATUS FOR GENERATING GAS.
The Carpenter & Barnum patent, No. 1,122,683, for apparatus for generating gas, the principal feature of which is a valve in the conduits between the retorts and the standpipe to facilitate the cleaning of the conduit, conceding that it discloses patentable novelty and invention, *held* not infringed.

3. PATENTS ⊚⇒112(3)—INFRINGEMENT—PRESUMPTION FROM ACTION OF PATENT OFFICE.
The granting of a patent while another application based on an invention for the same general purpose was pending, on which a patent was subsequently issued, is virtually a decision by the Patent Office that

<hr>

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the two inventions are patentably different and that one does not infringe the other.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 164; Dec. Dig. ☜112(3).]

**4.** Patents ☜328—Invention—Apparatus for Generating Gas.

The Carpenter & Barnum patent, No. 1,091,111, for apparatus for generating gas, the essence of which is the connecting of two vertical rows of retorts, one on either side, with the same standpipe, in view of the prior art, is void for lack of patentable invention.

In Equity.   Suit by the Riter-Conley Manufacturing Company against the Atlanta Gaslight Company and Richard C. Congdon.   On final hearing.   Decree for defendants.

On the 5th day of October, 1914, a bill in equity was filed by the plaintiff, a New Jersey corporation, against the defendant, a citizen and resident of the state of Georgia, and of the Northern district thereof, in this court, seeking to enjoin the defendant from infringing letters patent No. 1,091,111, which was for "apparatus for generating gas," which letters patent were granted to Henry A. Carpenter and Dana Dwight Barnum on March 14, 1914, on an application which was originally filed on December 2, 1910. It is alleged that the patent was, by certain deeds of assignment duly recorded in the Patent Office of the United States, pursuant to the acts of Congress in such cases made and provided, duly assigned, transferred, and set over to the Riter-Conley Manufacturing Company, a corporation of the state of New Jersey, with all of their right, title, and interest in and to the same. The plaintiff then alleges that it and those acting for and under it have extensively constructed, equipped, operated, and caused to be operated the said improvements described and claimed in said letters patent No. 1,091,111, and since the date of the letters patent and before the filing of the bill they have marked, or caused to be marked, the apparatus containing the improvements disclosed in the patent, with the words "Patented March 24, 1914," or other words and figures indicating that the apparatus was made in accordance with the letters patent named, in accordance with the statutes in such case made and provided. It is alleged that prior to the filing of the bill the defendants were duly notified of their infringement of said patent and requested to desist therefrom, but that the said defendants, well knowing the terms and rights secured to plaintiff, have, since the date of the letters patent, at Atlanta, Ga., and before the beginning of the suit, infringed upon plaintiff's rights by making or causing to be made, and used without plaintiff's leave or license, apparatus constructed in accordance with and embodying the invention described and claimed in the patent, whereby the defendants have realized large profits which in equity belong to the plaintiff, and have caused the plaintiff great and irreparable loss and injury to its business; that defendants threaten and intend to so manufacture, sell, and use such infringing apparatus within the Northern district of Georgia and at other places within the United States. The bill prays for an injunction, and for an accounting of the gains and profits realized by the defendants.

This original bill was answered by the Atlanta Gaslight Company, denying upon information and belief that Barnum and Carpenter were the true, original, or first joint inventors of the new or useful improvements in apparatus for generating gas, as alleged in the bill, and denying that the alleged invention was not known in this country, and not patented or described in any printed publication in this or foreign countries, before their alleged invention thereof. The defendant the Atlantic Gaslight Company then says that it is not informed, except by the bill of complaint, whether the application for patent was made as alleged, and leaves the plaintiff to make proof thereof, but denies that the letters patent granted to plaintiff for the term of 17 years, or any other term, the exclusive right to make, use, and vend the alleged invention throughout the United States and territories thereof, or any rights whatsoever; that it is not informed whether Barnum and Carpenter,

by instrument in writing, assigned to the plaintiff their rights in and to the improvements and to the letters patent of the plaintiff. It is not informed, except by the bill, whether letters patent for such alleged invention, in due form, were issued to the plaintiff, and says it is not informed, except by the bill, whether plaintiff was the sole and exclusive owner of the letters patent as claimed, or whether it has constructed and operated and has been marking its apparatus as claimed. It denies that the alleged inventions and discoveries have been of any benefit to the public, but avers that for ten years prior to the alleged invention and discovery the public already had knowledge of similar apparatus, and, so far as the same is at all practicable or useful, enjoyed the benefit of such apparatus.

The answer of the Gas Company then says that upon information and belief Barnum and Carpenter were not the original and first inventors or discoverers of the apparatus purporting to be covered by said letters patent, or of any material or substantial parts thereof, and that the same, or material or substantial parts thereof, had been described and illustrated in printed publications and patents prior to the date of the supposed invention of the said Carpenter and Barnum. It then cites such prior publications as follows:

Letters patent of the United States as follows:

Rowland, No. 211,591. 1879. Common communication with a group of retorts through a single standpipe.

Fowler, No. 808,831. 1906. Common communication with horizontal groups of retorts through a single standpipe.

Taussig, No. 694,443. 1902. Cleaning apparatus for standpipes showing common communication with vertical groups of retorts.

Wates, English, 5,513. 1880. Common communication with standpipe from groups of retorts, the standpipes being used as buck staves.

Hanson, English, 8,880. 1885. Takes the gas down instead of up, and makes common communication of vertical groups of retorts in two adjoining benches into one pipe.

Scobel, English, 421. 1858. Takes gas from a plurality of retorts by common communication through standpipes to the take-off pipe.

It denies that Carpenter and Barnum were the true, original, or first inventors of any new or useful improvement in apparatus for generating gas, as alleged in the bill. It says that the letters patent sued upon are invalid for want of patentable invention, and says that the apparatus described in plaintiff's alleged letters patent is a mere aggregation of elements and parts long known and used in the art for the period of five years or more; that there are not in plaintiff's alleged inventions and improvements any variations from previous combinations which would not occur to a mechanic of ordinary skill; that the elements, parts, and devices in plaintiff's apparatus perform precisely the same functions which are performed by these same elements, parts, and devices in previous combinations, which had been known and patented for more than five years prior to plaintiff's alleged invention and improvement.

The answer then says that the defendant has heretofore erected and operated, in connection with its gas plant in Atlanta, Ga., apparatus on the plan described and set forth in letters patent No. 1,090,813, issued to R. C. Congdon, a defendant hereto, on March 14, 1914, on an application duly filed April 29, 1913; that the principal objects of said apparatus were and are to prevent the accumulation of tar, pitch, and lamp-black inside the standpipe; to scrub the gas in the standpipe, and thus lessen the burden on the balance of the works, to increase the capacity of the exhausters, condensers, and scrubbers, to rapidly cool the gas inside the standpipe, to increase the candle power of the gas, to obviate the expense, annoyance, and work of cleaning the standpipe at frequent intervals by manual or mechanical means, and to reduce the first cost of the installation, while obtaining the advantages above cited; that the use of the apparatus in the form and combination specified in plaintiff's letters patent was and is not essential to the objects stated, and when plaintiff notified defendant of an alleged infringement by the use of one standpipe between two rows of retorts with common communication, defendant provided for changing the construction so as to use one standpipe to each vertical row of retorts. While defendant denies the validity of plain-

tiff's patent combination having for its object the dispensing with a multiplicity of pipes leading from the retorts to the hydraulic mains, defendant avers that the use of apparatus constructed according to the specifications of plaintiff's letters patent to accomplish the object obtained under the Congdon apparatus is not as practical as to use a separate standpipe for each vertical row of retorts. Defendant denies that the use of a single standpipe between two rows of retorts, whether in the same bench or in two benches, caused it to realize any profit in the operation of its plant. On the contrary, it caused an unnecessary expense in having to change the construction to a standpipe for each vertical row of retorts.

The answer of the Gas Company then states that it erected the apparatus with one standpipe between two rows of retorts before plaintiff's letters patent were issued. After their issue and plaintiff's complaint, the construction was changed as aforesaid, and the company denies all intention of continuing the former construction, and denies any and all threats to do so. It denies that it has injured and damaged the plaintiff in any sum whatever, in manner and form alleged, or otherwise.

The answer of the defendant Congdon is substantially the same as that of the Atlanta Gaslight Company, including the first 11 paragraphs, after which it proceeded to recount at some length and in considerable detail the conditions and circumstances leading up to and surrounding his claimed inventions, covered by letters patent Nos. 1,090,813, dated March 14, 1914, and 1,090,639, of June 9, 1914, and the erection of the plant of the Atlanta Gaslight Company, of which plaintiff complains. On motion of the plaintiff, however, this answer of the defendant Congdon was stricken from the twelfth to the twentieth paragraphs, inclusive. The twenty-first paragraph of said answer alleges that shortly after filing his application for said letters patent, to wit, in May, 1913, he communicated with the plaintiff, calling attention to the fact that his application was pending and that he expected to connect a plurality of retorts to a single standpipe, and that the ultimate object of his apparatus was to produce a pipe that would not stop up. The plaintiff replied, stating that it had installed at Worcester, Mass., a new style of standpipe which did not stop up, and that they had pending in the Patent Office for several years application covering that style of standpipe. This letter was dated May 13th, and on May 15th defendant again wrote to plaintiff, and, receiving no reply, wrote again on June 7th, and in these letters asked for information with reference to the plant at Worcester, and submitted blueprint and description of his own device, and also a rough sketch showing how eight retorts might have common communication with a standpipe. This defendant also wrote to Washington for copies of any patents which might be on file covering standpipes, but his inquiry elicited no information, for the reason that the Patent Office at Washington gives out no information of pending applications for patents; that although the application of plaintiff had been pending since December 2, 1910, with an assignment in favor of plaintiff authorizing the issue of letters patent direct to it, and although the plaintiff was, during all times referred to in said letters, fully advised of all claims of letters patent subsequently issued, plaintiff failed and refused to advise defendant of any of the details therefor, and did not procure the issuance of its letters patent until the 24th day of the following March, in the year 1914. This defendant then denies that he has injured and damaged plaintiff in any sum whatever, in the manner and form as alleged or otherwise.

An amendment to the bill of complaint was filed on January 20, 1915, by consent of the defendants, alleging that on and prior to the 24th day of July, 1913, Henry A. Carpenter and Dana D. Barnum were the original, first, and joint inventors of certain new and useful improvements in coal gas generating apparatus, on which an application for letters patent was filed by the said Carpenter and Barnum on the 24th day of July, 1913, and whereupon such proceedings were had that on the 29th day of December, 1914, letters patent of the United States No. 1,122,683, were granted to the said Carpenter and Barnum, assignors to the Riter-Conley Manufacturing Company for the said invention in conformity with the requirements of the statutes. A duly authenticated copy of said letters patent was presented and prayed to be taken as a part of the bill. Plaintiff then avers that the invention described and

claimed in letters patent No. 1,122,683 is of great value to it, and further avers on information and belief that the defendants have, since the date of said patent No. 1,122,683, and before the commencement of this suit, and are still, within the Northern district of Georgia and elsewhere in the United States, without license or permission of plaintiff and in infringement of said letters patent, making, using, and vending to others to be used, coal gas generating apparatus embodying the invention claimed in said letters patent, to the plaintiff's great damage, and that the defendants have been duly notified of said letters patent and of its infringement thereof in violation of the plaintiff's rights thereunder. Plaintiff further avers on information and belief that defendants are prepared and ready to continue said infringement, and that unless restrained from doing so plaintiff will suffer great and irreparable damages, and alleges that defendants have derived and received and are still deriving and receiving from said infringing acts great gains and profits. The prayers of the original bill are then repeated.

To this amendment a joint answer was filed by the defendants, denying, on information and belief, that the said Carpenter and Barnum were the first, original, and only inventors of certain new and useful improvements in coal gas generating apparatus, as alleged therein, and say that it is not true that the alleged invention was not known or used by others in this country before their invention and not patented or described in any printed publication in this or foreign countries before their alleged invention thereof. Defendants admit the filing of the application for patent and the granting of letters patent as alleged. Defendants admit the assignment of said letters patent to the complainant in this case as alleged, and answer that for lack of information they can neither admit nor deny the value of said alleged invention, but deny that they or either of them have, before or since the date of letters patent No. 1,122,683, or before or since this suit was brought or said amendment filed, within the Northern district of Georgia, or elsewhere within the United States, made, used, vended to others to use, or otherwise infringed in any manner said letters patent No. 1,122,683, and deny that they have damaged the complainant in any manner, as the owners of said letters patent. Defendants aver that they had no notice of letters patent No. 1,122,683, or of any alleged infringement thereof, until this amendment was drafted and presented to their solicitors in this case, on or about the 1st day of January, 1915, but deny any and all infringement of the alleged invention, and deny that the continuance of their present operations will in any manner damage complainant.

Further answering, defendants allege that the apparatus, or material and substantial parts thereof, had been described and illustrated in printed publications and patented prior to the date of the supposed intention of said Carpenter and Barnum, and cite specific instances of such prior publication as follows: United States letters patent issued to T. P. Rowland, No. 211,591, dated January 21, 1879, showing a valve connection between a group of retorts and a standpipe in gas manufacturing apparatus. United States letters patent issued to Richard C. Congdon, No. 1,090,813, dated March 17, 1914, showing a valve connection between a group of retorts and a standpipe in gas manufacturing apparatus. United States letters patent issued to Richard C. Congdon, No. 1,099,639, dated June 9, 1914, showing a valve for establishing and disestablishing communication between a standpipe and a retort in gas producing apparatus. British letters patent of Wates, No. 5,513 in the year 1880, disclosing a valve connection between a retort and a standpipe. French patent No. 416,924, issued to Breuer et cie., August 18, 1910, which shows the combination covered under the claims of letters patent No. 1,122,683, in connection with the gas main instead of in combination with the retort.

Defendants further say, upon information and belief, that the letters patent No. 1,122,683, sued upon in said amendment, are invalid for want of patentable invention, that the same is a mere aggregation of elements and parts long known and used in the art for a period of five years or more, that there are not in plaintiff's alleged invention any variation from previous combinations which would not occur to a mechanic of ordinary skill, and that the elements, parts, and devices therein perform precisely the same functions that were performed by the same elements, parts, and devices in previous

combinations which had been known and patented prior to the alleged invention and improvement described in letters patent No. 1,122,683. Defendants say that the structure at the plant of the defendant Atlanta Gaslight Company, which plaintiff claims is an infringement of letters patent sued upon herein, is erected in accordance with the specifications of letters patent Nos. 1,090,813, of March 17, 1914, and 1,099,639, of June 9, 1914, to Richard C. Congdon, and deny that said apparatus in any manner infringes the letters patent of plaintiff here sued upon, even though plaintiff's letters patent should be held valid. Defendants also deny that they injured and damaged the plaintiff in any sum whatsoever, in manner and form alleged or otherwise.

The answers of defendants were then amended by adding to the prior publications cited the following: Letters patent of the United States, No. 693,137, dated February 11, 1902, to C. W. Isbel, for apparatus for the manufacture of illuminating gas; and letters patent of the United States, No. 440,456, dated November 11, 1890, to Allen & Harris, for apparatus for the manufacture of gas.

A second amendment to the bill of complaint was filed, with consent of the defendant, on June 5, 1915, bringing into the suit United States letters patent No. 1,140,113, granted to said Carpenter and Barnum on the 18th day of May, 1915, application for which was originally filed July 24, 1913, and making practically the same allegations with reference thereto that were made in the first amendment with reference to letters patent No. 1,122,683.

On June 18, 1916, the defendants filed a joint and several answer to this second amendment, making practically the same answers as with reference to the first amendment, except that they say, for want of sufficient information, they can neither admit nor deny that said Carpenter and Barnum were the original, first, and joint inventors of the alleged improvement in the method of manufacturing gas, but allege that the material and substantial elements of said alleged patent had been described and illustrated in prior patents, that the letters patent are invalid for want of patentable invention, and that the manner of manufacturing gas as described in letters patent No. 1,140,113 is a mere aggregation of methods long known and used in the art of manufacturing gas, for a period of five years or more.

F. T. Chambers, of Philadelphia, Pa., and Candler, Thomson & Hirsch, of Atlanta, Ga., for plaintiff.

A. B. Stoughton, of Philadelphia, Pa., and Smith, Hammond & Smith, of Atlanta, Ga., for defendants.

NEWMAN, District Judge (after stating the facts as above). The order in which these patents were brought into this suit is shown in the above statement of the pleadings. The patent on which the suit was originally brought, No. 1,091,111, called the "standpipe patent," was granted to Carpenter and Barnum on March 24, 1914. The first amendment sets up patent granted to Carpenter and Barnum on the 29th day of December, 1914, called the "valve patent," or "lateral patent"; and the second amendment sets up a patent granted to Carpenter and Barnum on May 18, 1915, No. 1,140,113, which has been called, in this litigation, the "method patent," and sometimes the "process patent."

[1] In order to understand this last patent it has been necessary to examine with care the proceedings in the Patent Office with reference to the granting of this particular patent, and that has been made possible by the introduction in evidence of the file wrapper in the case. This patent was applied for, in different ways, four times before it was granted. From an examination of the different applications, and

the claims attached to each application, it appears that three times the claims made were rejected by the Commissioner of the Patent Office. The claims of the patent as finally granted are as follows:

"1. In the manufacture of coal gas, the method herein described of reducing standpipe stoppage, consisting in discharging gas from a plurality of generating retorts directly into a vertical path formed by a standpipe and common to all of said retorts, and timing the charging with coal of each retort relatively to the charging of all the other retorts to maintain the temperature of said vertical path substantially uniform.

"2. In the manufacture of coal gas, the method herein described of reducing standpipe stoppage, consisting in discharging gas simultaneously from a plurality of generating retorts directly and through relatively short lateral paths into a vertical path, said vertical path being formed by a standpipe and common to all the retorts, and timing the charging with coal of each retort relatively to the charging of all the other retorts to maintain the temperature of said vertical path substantially uniform.

"3. In the manufacture of coal gas, the method herein described of reducing standpipe stoppage, consisting in discharging gas from a plurality of generating retorts directly and in lateral direction into a vertical path formed by a standpipe and with the gas entering said path at different elevations, and timing the charging of each retort with coal relatively to the charging of every other retort to maintain the temperature of said vertical path substantially uniform.

"4. In the manufacture of coal gas, the method herein described of reducing standpipe stoppage, consisting in charging a group of retorts with coal at different times and thereby creating overlapping carbonization periods, the time of charging each retort of the group being remote from the time of charging the retorts nearest thereto and thereby minimizing variation in temperature of the retorts and of the gaseous output thereof, maintaining direct communication between each retort during its carbonization period and a vertical path with said path formed by a standpipe common to all the retorts, and timing the charging of each retort relatively to the charging of all the other retorts to maintain the temperature of said path substantially uniform.

"5. In the manufacture of coal gas, the method herein described which consists in charging in sequence a plurality of gas generating retorts with coal and retaining the charges within the retorts for corresponding periods of time and thereby maintaining overlapping carbonization periods of corresponding duration for all the retorts, discharging the gas from all the retorts directly into a vertical path with said path inclosed by a standpipe and common to all the retorts, and timing the charging of each retort relatively to charging of all the other retorts to maintain the composite gaseous stream within said vertical path substantially uniform in quality, temperature and volume.

"6. In the manufacture of coal gas, the method herein described, consisting in discharging gas simultaneously from a plurality of generating retorts directly into a vertical path formed by a standpipe, said path common to all the retorts and proportioned relatively to the latter to forestall back pressure in any retort, and timing the charging with coal of each retort relatively to the charging of all the other retorts to maintain a gaseous stream within said path of substantially uniform volume."

The claims that were rejected the last time by the Commissioner of the Patent Office, and which were succeeeded by the claims of the patent as issued, given above, were as follows:

"1. In the manufacture of gas, the method herein described which consists in heating a plurality of retorts to coal carbonizing temperature, charging the retorts with coal in such sequence as to produce carbonization periods differing one from another as to time of commencement, and separately delivering the gas from the retorts to a vertical standpipe during the respective carbonization periods, the sequential charging of the apparatus producing in-

dividual deliveries differing as to carbonization stages with each delivery of substantially uniform stages.

"2. In the manufacture of coal gas, the method herein described which consists in heating a plurality of retorts to coal carbonizing temperature, charging the retorts with coal in such sequence as to produce carbonization periods differing one from another as to time of commencement, and separately delivering the gas from the retorts to a vertical standpipe during the respective carbonization periods, the individual deliveries being in substantially uniform stages, the sequential charging producing a definite relationship between the gas delivery of different retorts.

"3. In the manufacture of coal gas, the method herein described which consists in heating a plurality of retorts to coal carbonizing temperature, charging the retorts with coal in such sequence as to produce carbonization periods differing one from another as to time of commencement, separately delivering the gas from the retorts to a vertical standpipe during the respective carbonization periods, the charging of the retorts in sequence and the delivery of the gas to the standpipe in stages differing from each other as to temperature, quality, and volume producing, through the resultant action of these differences, a diffusion of the deliveries within the standpipe with the outflow of gas from the standpipe substantially uniform in quality, temperature, and volume.

"4. In the manufacture of coal gas, the method herein described which consists in heating a plurality of retorts to coal carbonization temperature, charging the retorts with coal in such an isolation sequence as to produce carbonization periods differing one from another as to time of commencement, separately delivering the gas from the retorts to a vertical standpipe during the respective carbonization periods, the charging of the retorts in sequence and the delivery of the gas to the standpipe in stages differing from each other as to temperature, quality, and volume producing, through the resultant action of these differences, a diffusion of the deliveries within the standpipe with the outflow of gas from the standpipe substantially uniform in quality, temperature, and volume.

"5. In the manufacture of coal gas, the method herein described which consists in heating a plurality of retorts to coal carbonizing temperature, charging the retorts with coal in such sequence as to produce carbonization periods differing one from another as to time of commencement, separately delivering the gas from the retorts to a vertical standpipe during the respective carbonization periods, the several deliveries being above the standpipe lower end, and charging of the retorts in sequence and the delivery of the gas to the standpipe in stages differing from each other as to temperature, quality, and volume producing, through the resultant action of these differences, a diffusion of the deliveries within the standpipe with the outflow of gas from the standpipe substantially uniform in quality, temperature, and volume.

"6. In the manufacture of coal gas, the method herein described which consists in heating a plurality of retorts to a coal carbonizing temperature, charging the retorts with coal in such sequence as to produce carbonization periods differing one from another as to time of commencement, separately delivering the gas from the retorts to a vertical standpipe during the respective carbonization periods, the several deliveries being above the standpipe lower end and differing as to elevation, the charging of the retorts in sequence, and the delivery of the gas to the standpipe in stages differing from each other as to temperature, quality, and volume producing, through the resultant action of these differences, a diffusion of the deliveries within the standpipe with the outflow of gas from the standpipe substantially uniform in quality, temperature, and volume.

In rejecting these claims, the Commissioner of Patents quotes the opinion of the examiner in charge of the application as follows:

"This application has been reconsidered in view of the amendment filed December 29, 1914. The claims presented by the above amendment are held not to patentably distinguish from the references of record, and are according-

ly rejected. The fact that the applicant delivers his gas to a vertical stand-pipe is immaterial to the process. In this respect the claims are objected to in form for the reason that they confuse process and apparatus. So far as regards the operation of the process, the gas could just as well be delivered to a horizontal main as to a vertical main or standpipe. To deliver the gas to a common vertical standpipe is not new with the present applicants. This is shown old in the patents of record as far back as 1858. This idea is also common, as shown in the British patent 8,880 of 1885, also of record, and will also be seen in British patent 5,513 of 1880, of which patent the applicants are well acquainted. In connection with the process which consists in heating a plurality of retorts to coal carbonizing temperature, charging the retorts with coal in such sequence as to produce carbonizing periods differing one from another as to time of commencement, and separately delivering the gas from the retorts to a main during the respective carboniza-tion periods, the sequential charging of the apparatus or retorts producing individual deliveries differing as to carbonization stage with each delivery of substantially uniform sequence, has been shown old in the patent to Slade, reissue, 8,422. To combine with the structure shown in this patent the well-known vertical standpipe, shown in the patents of record, would not amount to a patentable invention. Attention must be particularly called to the patent to Slade and the matter on page 1, line 7, to the end of the paragraph 3, column 1. Furthermore, to highly heat the retorts before charging the same with fuel is common in the art of making gas from coal. This is ac-complished by the patent to Slade, and can be shown, by the examiner, in other patents, if the applicant so desires. It is not seen that there is anything patentable in the case. If the applicant so desires, this action may be con-sidered final."

This opinion of the Commissioner certainly disposes of all of the claims which were then made, and apparently upon excellent grounds. In the Slade patent, referred to by the Commissioner, the method of charging, shown in the patent, is as follows:

"By the usual method of manufacturing illuminating or coal gas, the re-torts are set three, five, or more in one bench, all heated by one fire, and are usually charged all, or nearly all, at one time, thus reducing the temperature to such a degree at the most important time, when the coal is throwing off the gas the fastest, that the gas is not permanent, but most of it condensed to tar and water, in the hydraulic main or condensors, owing to its being gener-ated at too low a temperature. Now my object is to prevent loss of heat at this time in using the ordinary bench or benches or retorts; and this I effect by charging only one or two retorts at a time (preferably the former), select-ing for the purpose such retort or retorts as are at a distance as far as possible from those last charged, so that the retorts that have had time to regain their heat will act as heat reservoirs and impart or give off their sur-plus heat to the new charge, thus preventing, in the newly charged retort or retorts, the excessive lowering of temperature, to which, under the method of charging hitherto employed, they have been subjected at the time they are doing the most work."

It would therefore appear that the Commissioner's conclusion as to the nonpatentability of this method, as shown in the claims then in question, is clearly correct. The method patent later granted to Carpenter and Barnum must therefore be confined to so much there-of as is added in the claims after the action of the Patent Office as stated.

The applicant proposed in these last set of claims two things: One was to "reduce standpipe" stoppage, and the other was to "forestall any back pressure in any retort." As to this method of introducing gas into a standpipe from overlapping charges, at differing stages of

carbonization of the coal, and of thus commingling the gases given off by the coal at differing stages of carbonization, it is pretty clear that it is not infringed by Congdon or the Atlanta Gaslight Company. If anything was demonstrated in this case by the evidence, it was the fact that this commingling of the gases at differing stages would not, of itself, prevent accumulations in the standpipe. A piece of pipe from the Atlanta gas works was brought into court during the trial, in which the water, which flows down the standpipe for the purpose of preventing accumulations in the pipe, in the method used by Congdon and the Atlanta Gaslight Company, was stopped for a period of 27 hours during the normal operation of the plant. The stoppage in this standpipe and the accumulation there during this period was so clear and manifest that, when taken in connection with the evidence with reference thereto, it must have convinced any one and every one who saw it that without the use of this water the stoppage would to a large extent occur.

The standpipe brought into court was smaller, it is true, than the standpipe which was offered in evidence by the plaintiff as one of its standpipes; but, notwithstanding this, the accumulations were such as to show that, without the use of water, this stoppage in the standpipe will occur, and must of necessity be removed by other means than the mere overlapping charges and the commingling of the gases at the differing stages of carbonization. It is true that, in the evidence for the plaintiff by Dr. Lessing and Mr. Nims, and by the charts introduced by Mr. Nims, it is shown that the averaging of the temperature by this overlapping of charges does result in a reduction of the stoppage in the standpipe, and it might be conceded does very considerably reduce it.

I also understand, from the deposition of Mr. Barnum, that considerable weight seems to be attached to the fact that the plan they devised for overcoming standpipe stoppage included the provision of a large standpipe. In Mr. Barnum's deposition, in speaking of a conversation between Carpenter and himself, he says:

"We also discussed all of the other designs and methods of construction, and all the things that other operators had done in order to get rid of the stoppages. During one of these conferences we developed the idea of having a large vertical pipe connected by means of short conduits or passageways with a vertical row of retorts. It was plainly apparent that with this construction we could have larger gas way and more uniform condition in the standpipes, that the short connection between the retort and the standpipe could be easily cleaned from the opening of the retort lid, if any deposit should take place, that the large pipe would give more uniform conditions as to temperature, flow of gas, and of the condition of the deposit in the pipe, and that, if there was any deposit in the pipe it would be easily taken care of and would naturally roll down the pipe to a receptacle at the bottom."

I do not understand from the patent that the size of the standpipe has anything to do with the result to be obtained; but even if it be conceded that the enlargement of the standpipe was a part of the Carpenter and Barnum method, and even if it be further conceded that the size of the standpipe and the commingling of the gases produce, together, greater results in the prevention of stoppage than I have

indicated above, still it is perfectly clear from all of the evidence, and from the opposing patents in evidence, that the Congdon method of preventing stoppage is entirely different from anything that could be used by Carpenter and Barnum under their method patent.

The contention by counsel for plaintiff, that the stoppage in the section of standpipe produced by defendant in court was due to the projection into the standpipe of the lateral passage and valve as used in defendant's construction, is, to my mind, wholly without merit. The whole facts of the case, as shown by the evidence, are, I think, contrary to this contention.

The defendant Congdon has a patent, issued to him on March 17, 1914, upon an application filed April 29, 1913, which has been called in this litigation the "scrubber" patent, covering the use of water flowing down the standpipe, which adds, of course, to the strength of his defense in respect to the use of the overlapping periods of carbonization to prevent or reduce this stoppage in the standpipe.

The prevention or forestalling of back pressure in any retort, claimed to be one of the things accomplished by plaintiff's method patent, as set out in the sixth claim of the patent, seems to me to be entirely without merit. Not very much was said, in the argument, about this claim of the patent, and very little is shown in the proof. The argument by counsel for plaintiff refers to an exhaust fan as a remedy for this "back pressure," or as an alternative the valve covered by one of the patents in suit. The exhaust fan, while referred to in the argument, cannot possibly be considered as any part of the patent method, as it is nowhere set out or referred to in the claims or specifications. As I understand the matter, however, the chief contention is that the commingling of these gases in the standpipe at different stages of carbonization of the coal reduces the temperature and renders it more uniform, and thereby prevents the temperature from becoming such as to cause back pressure through the lateral and the mouthpiece. It cannot be that the defendant has infringed this, because he does not pretend to reduce the temperature, or to render it uniform by the use of this method of overlapping charges and the consequent commingling of the gases at differing stages, but by the use of water, as heretofore stated, running down the sides of the standpipe. Unless the defendants are infringing upon the main purpose of this method patent, that is, to prevent stoppage in the standpipe, it can hardly be that they are infringing the sixth claim, in reference to preventing back pressure.

In addition to all that has been said above, it seems to me that plaintiff's method patent is but the result of a combination of old elements, well known in the art long prior to the time Carpenter and Barnum attempted to utilize them in this method patent. At least, all that is now in it would seem to me, independently of the Patent Office, except possibly the overlapping charges (and that was clearly rejected as not patentable by the Patent Office), to be the method of commingling the gases in the standpipe, and that only to prevent the standpipe stoppage.

It would be interesting to me, and would greatly strengthen what I have said in reference to this method patent of the plaintiff's, to discuss somewhat, and perhaps at some length, the testimony of Richard C. Congdon, as given before the court, Mr. P. D. Dashiell, as given in his deposition taken in Philadelphia and his testimony before the court, and other witnesses for the defendants. They seem to me, by their testimony, to make as near a demonstration as it is possible to make of the marked difference of the method used by Congdon and the Atlanta gas works from that of the plaintiff, and to show that the method of the plaintiff's patent is in no way infringed by what the defendants are doing. But I do not wish to take more time than I have, or to extend this opinion by any further discussion of the matter, even though it might add considerably to what I have said in reference to the conclusion I have reached.

There must be a decree against the plaintiff and in favor of the defendants as to this patent.

[2] Now, the other two patents are mechanical devices relating to physical features of the apparatus, or, as counsel for plaintiff says, the apparatus which is essential to the carrying out of the novel purpose of the method patent. Taking them in the inverse order, as I am doing, the next patent would be No. 1,122,683, called the lateral or valve patent. There are five claims as to this patent, but counsel for plaintiff say they rely only upon the fifth claim, because it embraces everything contained in either or all of the others, as I understand it. This fifth claim is as follows:

"The combination of a bench having a series of retorts therein arranged horizontally at different elevations, mouthpieces—one for each retort—projecting from the bench, each mouthpiece having a door-closed opening, standpipe located at the exterior of the bench, a series of laterally extending conduits, one for each mouthpiece, each conduit open at one end to its mouthpiece at a point adjacent the door-closed opening of the latter, the opposite ends of the conduits separately open to the standpipe, whereby the latter comprises an upright off-take common to the series of retorts, and a valve for each conduit located at the standpipe end thereof, whereby the entire length of the conduit is accessible from its mouthpiece for cleaning when the valve is closed."

The main feature of this, as contended for by counsel, is that the lateral passage from the mouthpiece to the standpipe has a valve which closes it in such a way as to allow the ready and satisfactory cleaning of this lateral passage. It seems that there is a deposit which accumulates as the passage of gas through this lateral passage proceeds, which requires to be cleaned out, and the main argument here has been that the ease with which it can be cleaned and the ready access to its entire length are the material features of the patent and of the invention. The difficulty about that is that it is perfectly clear that the valve between the retorts and the standpipe is certainly an old feature in the art.

The defendants set up, in answer to this first amendment to the bill, which sets up this patent No. 1,122,683; United States letters patent issued to T. P. Rowland January 1, 1879, No. 211,591, showing a valve connection between a group of retorts and a standpipe

in a gas manufacturing apparatus; United States letters patent No. 1,090,813, issued to Richard C. Congdon on March 17, 1914; United States letters patent No. 1,099,639, issued to Richard C. Congdon June 9, 1914, showing a valve for the establishment and disestablishment of connection between a standpipe and a retort in a gas producing apparatus; British patent to Wates No. 5,513, issued in 1880, disclosing a valve connection between a retort and a standpipe; and French patent No. 416,924, issued to Breuer et cie., August 18, 1910, which, it is claimed, shows the combination covered by the claims of letters patent No. 1,122,683, in connection with the gas main instead of in combination with the retort.

I do not think the defendants are infringing this device of the plaintiff's, even conceding it to be novel and a patentable invention. The defendants use a valve which falls back into the standpipe, when the lateral passage is open and the valve is not in use. The valve, when closed, does shut off the lateral from the standpipe, but does it in a different way and comes into the lateral differently from that of the plaintiff.

[3] The Congdon valve patent was applied for March 14, 1914, and was granted June 9, 1914. The plaintiff's valve patent was applied for originally on July 24, 1913, and was divided, and the application on which the patent was granted was filed September 17, 1914, and the patent granted on December 29, 1914. It is therefore evident that plaintiff's application for its valve or lateral patent was pending in the Patent Office at the time that Congdon's application was filed and at the time his patent was granted, so that the Patent Office must have considered that the difference between the two devices was so manifest that it was justified in granting the Congdon patent notwithstanding the pendency of the Carpenter and Barnum application. On this point the Supreme Court, in Boyd v. Janesville Hay Tool Co., 158 U. S. 260, 261, 15 Sup. Ct. 837 (39 L. Ed. 973) in the opinion by Mr. Justice Shiras, says this:

"As both applications were pending in the Patent Office at the same time, and as the respective letters were granted, it is obvious that it must have been the judgment of the officials that there was no occasion for an interference, and that there were features which distinguished one invention from the other. In Pavement Co. v. City of Elizabeth, 4 Fish. 189 [Fed. Cas. No. 312], Mr. Justice Strong said: 'The grant of the letters patent was virtually a decision of the Patent Office that there is a substantial difference between the inventions. It raises the presumption that, according to the claims of the latter patentees, this invention is not an infringement of the earlier patent.' It would also seem to be evident that as the purpose of the invention was the same, and as the principal parts of the respective machines described were substantially similar, it was also the judgment of the office that the distinguishing features were to be found in some of the smaller, and perhaps less important, devices described and claimed. Burns v. Meyer, 100 U. S. 671 [25 L. Ed. 738]."

It is true that some of the old patents showing valves, cited and discussed above, seem to have been for use in the manufacture of water gas; but I do not think that should prevent their consideration as prior, and as showing the similarity of the old arrangements to the one patented by Carpenter and Barnum.

[4] In reference to the patent set up in the original bill, No. 1,-091,111, granted to Carpenter and Barnum on the 24th day of March, 1914, this is also one of the mechanical patents which, it is claimed, was devised to carry out the method patent of the plaintiff. The claims are brief, and are as follows:

"1. In an apparatus for generating gas, the combination with two rows of superposed parallel retorts, of a standpipe located between the two rows of retorts and between the vertical planes passing through the longitudinal axes of the retorts in each row and in common communication with the retorts of the two rows, and a takeoff pipe in communication with the standpipe.
"2. In an apparatus for generating gas, the combination with two gas benches arranged side by side, a retort in each bench, said retorts extending back from a common face of the generator, a standpipe located between the vertical planes passing through the longitudinal axis of each of the said retorts, and means connecting the standpipe with the retort of each bench."

It is granted apparently, as will be seen from the claims, for two vertical rows of retorts, one on either side of a standpipe, and both emptying into the same standpipe. It is expressed somewhat differently in the technical language of the patent claims; but that is what it is substantially for.

In answer to plaintiff's bill, which sets up this patent and claims its infringement, the defendants set up the United States patent to Rowland, No. 211,591, issued in 1879, as showing common communication with a group of retorts through a single standpipe; United States patent to Fowler, No. 808,831, issued in 1906, as showing common communication with horizontal groups of retorts through a single standpipe; United States patent to Taussig, No. 694,443, issued in 1902, cleaning apparatus for standpipes showing common connection with vertical groups of retorts; Wates, English patent, No. 5,513, issued in 1880, showing common communication with standpipe from group of retorts, the standpipes being used as buck staves; Hanson, English patent, No. 8,880, of 1885, which takes the gas down instead of up, and makes common communication of vertical groups of retorts in two adjoining benches into one pipe; Scoble, English patent, No. 421, of 1858, which takes gas from a plurality of retorts by common communication through standpipes to the take-off pipe.

There were a number of claims in this patent as originally presented to the Patent Office, and there were, apparently, a number of rejections of the claims, until finally the patent was allowed with the claims which have been stated above. This patent, to me, is of very doubtful validity. It seems to me to be thoroughly anticipated by former patents. Take the Rowland patent, United States letters patent No. 211,591, issued in 1879; the second claim of that patent is this:

"In a bench of fixing retorts, consisting of two or more series of retorts, the combination, with each series, of a common supply pipe, connecting it to a main supply pipe at one end, and a delivery pipe, connecting it to a main delivery pipe at the other end, each retort being provided with a valve at both its supply and delivery ends, and each delivery and each supply pipe connected with each series being provided with a separate valve, by means of which said series may be cut off from all other series, substantially as described."

The important thing is the emptying of a series of retorts into a common standpipe. As to this there seems to be no question about the prior art, and that this was well understood and used in the art of gas making for many years before the present patent was allowed. In the Hanson English patent take this in the specifications:

"Fig. 5 is a cross-section of two benches of retorts placed a sufficient distance apart to enable the hydraulic main descension pipes and anti-dip valve to be fixed between them; in this case the anti-dip valve $D$ connects each two opposite descension pipes, and is placed between them as shown. One hydraulic main does for two benches of retorts, instead of two required under the present system."

This is quite different, it is true, from the Carpenter and Barnum patent; but it shows exactly the same idea as to the emptying of a number of retorts into a common standpipe. Now, to have two vertical rows of retorts emptying into a common standpipe, as Carpenter and Barnum do, appears to me to be a mere duplication of what was well understood before, and not anything novel or patentable. Dr. Rudolph Lessing, of England, a distinguished expert in the manufacture of gas, and in his knowledge and experience with gas apparatus, testified as a witness for the plaintiff in the present case, as follows, on cross-examination:

"Q. Turning, then, to the other patent—No. 1,091,111—in your opinion could a structure in which but one row of retorts connected to a common standpipe laterally be the thing described and claimed in that patent, or do you consider that that patent is addressed to a case where there are two rows? A. It specifically mentions two rows in the claim. Q. Yes, sir. So it would be your opinion that, where there are not two rows connected to one standpipe, there would not be the structure that those claims present? A. I think this is quite clear from the claims of this patent. Q. Won't you please state what difference there is, except perhaps in degree, whether there be a row connected to but one side of the standpipe, or there be two rows connected one on each side of the standpipe? A. Would you mind explaining more clearly? I don't quite understand the question. Q. Yes, sir; I will be glad to. What difference in result, in your opinion, would take place whether the structure has one row of retorts connected in common to a standpipe, as in this patent, or whether there be two rows connected to a standpipe, so as to discharge in common? A. The difference would be largely one of degree; that is to say, a number of retorts discharging into one standpipe would affect the degree of efficiency of the whole combination. Q. It would affect the degree rather than the character of the result, would it not? A. Except inasmuch as the construction of the whole gas bench is involved, because obviously, where one standpipe can be disposed between two benches constructural possibilities arise which are not possible in a case where only one vertical row of retorts discharge into each standpipe, where you want an extra pipe or where you would have an extra pipe necessary for each vertical row of retorts. Q. But so far as the operation of making gas goes, the difference, if any, in the result is one of degree rather than kind? A. Quite so."

My view of the matter is this: That, just in line with what has been quoted above from Dr. Lessing, there would seem to be nothing novel and nothing patentable, where it was well understood that a series of retorts could be emptied into a common standpipe, to make two vertical rows of retorts empty into a common standpipe instead of one.

This seems to me to involve a mere mechanical arrangement, and could hardly be considered the exercise of inventive genius, such as would be required to make it patentable.

It is denied here, as I understand it, that either Congdon or the Atlanta Gaslight Company is now using this arrangement of a row of retorts on each side entering into a common standpipe. Instead they have only one row of retorts on one side of the standpipe at the front or charging end of the retorts, and then a standpipe for another row on the discharging end of the retorts, which they at one time had connected with the standpipe on the charging end. In other words, as I understand their position as stated by them, they are not using this plan now of having a vertical row of retorts on each side of a common standpipe, and they do not desire to do so. But, whether this be true or not, to my mind the claims as to this patent cannot be sustained, because, if it be a thing patentable at all, it was very clearly anticipated as to one row of retorts, and I think, for the reasons I have stated, also anticipated as to two rows of retorts.

There are a number of other patents pleaded here, to which I do not care to refer more particularly—the Wates English patent, No. 5,513 of 1880, which, it is claimed, anticipates the plaintiff's standpipe patent; and the Taussig patent, No. 787,061 of 1905, which claims an apparatus for the manufacture of coal gas the combination of a stack of retorts comprising a plurality of benches each containing vertical rows or sets of non-communicating retorts having their mouthpieces in vertical alignment, showing the same character of construction claimed here.

In view, therefore, of the prior state of the art, there was nothing whatever new, certainly as to a single row of retorts emptying into a common standpipe, and the emptying of two vertical rows of retorts into a common standpipe seems to me to be a mere duplication of the former common usage of one row of vertical retorts emptying into a common standpipe. Consequently I do not regard this standpipe patent, No. 1,091,111, as a patentable invention.

Summing the whole matter up, it is this:

Complainant's patent No. 1,140,113, the "method" patent, restricted and limited as it must be by its history in the Patent Office, is not infringed by anything done by the defendants, who use a method described in Congdon's patent No. 1,090,813, known as the "scrubber" patent, using water down the sides of the standpipe, thereby causing proper temperature in the standpipe and preventing accumulation.

As to plaintiff's patent No. 1,122,683, the "valve" or "lateral" patent, the valve used by the defendants is entirely dissimilar to that of the Carpenter and Barnum patent, and consequently there is no infringement.

As to plaintiff's patent No. 1,091,111, the "standpipe" patent, the discharging of a vertical row of retorts into a common standpipe was so well known before this patent was granted, and the discharging of two vertical rows of retorts into a common standpipe being a mere

duplication of what was well known and understood in the prior art, the claims of this patent cannot be sustained.

The result is that there must be a decree in favor of the defendants, and dismissing the plaintiff's bill.