RITER–CONLEY MFG. CO. v. ATLANTA GASLIGHT CO. et al.

(Circuit Court of Appeals, Fifth Circuit. October 4, 1917.)

No. 3021.

PATENTS ⬿328—VALIDITY AND INFRINGEMENT—GAS MAKING APPARATUS.

The Carpenter & Barnum patents, No 1,091,111, for a standpipe, for use in the manufacture of gas, and No. 1,140,113, for a process of reducing stoppage in such standpipes, are void for lack of invention, in view of the prior art. No. 1,122,683, for a valve for lateral conduits leading from gas retorts to the standpipe, *held* not infringed.

Appeal from the District Court of the United States for the Northern District of Georgia; William T. Newman, Judge.

Suit in equity by the Riter-Conley Manufacturing Company against the Atlanta Gaslight Company and Richard C. Congdon. Decree for defendants, and complainant appeals. Affirmed.

For opinion below, see 234 Fed. 896.

Harold Hirsch, of Atlanta, Ga., J. M. Nesbit, of Pittsburgh, Pa., and Francis T. Chambers, of Philadelphia, Pa., for appellant.

Alex W. Smith, of Atlanta, Ga., for appellees.

Before PARDEE, WALKER, and BATTS, Circuit Judges.

WALKER, Circuit Judge. The bill in this case as it was amended complained of the alleged infringement by the defendants (the appellees), the Atlanta Gaslight Company and Richard C. Congdon, of three United States patents owned by the plaintiff, the Riter-Conley Manufacturing Company, namely, No. 1,091,111, which will be referred to as "the standpipe patent," No. 1,122,683, which will be referred to as the "valve" or "lateral patent," and No. 1,140,113, which will be referred to as the "process patent." Each of these patents purported to protect an invention made by Henry A. Carpenter and Dana Dwight Barnum, who were the assignors of the plaintiff. The construction and operation of an apparatus located in the gas manufacturing plant at Atlanta, Ga., of the defendant, the Atlanta Gaslight Company, constituted the alleged infringement which is complained of. The appeal is by the plaintiff from a decree dismissing the bill as it was amended. The opinion rendered by Judge Newman shows that this decree was the result of his conclusions that nothing that had been done by the defendant infringed either the process patent or the valve or lateral patent, and that the standpipe patent is invalid. Riter-Conley Mfg. Co. v. Atlanta Gaslight Co. (D. C.) 234 Fed. 896.

One of the difficulties in the manufacture of coal gas, as that business has been conducted for many years, is due to stoppages in the standpipe into which the gas generated by the burning of coal passes when it leaves the retort; such stoppages being the result of substances which are thrown off from the gas after it leaves the retort being attached to the side of the standpipe and accumulating thereon until the passageway through the standpipe is wholly or partially clos-

ed.  The process patent in suit purports to disclose a new and improved method of dealing with this difficulty.  The claims of that patent are as follows:

"1. In the manufacture of coal gas, the method herein described of reducing standpipe stoppage, consisting in discharging gas from a plurality of generating retorts directly into a vertical path formed by a standpipe and common to all of said retorts, and timing the charging with coal of each retort relatively to the charging of all the other retorts to maintain the temperature of said vertical path substantially uniform.

"2. In the manufacture of coal gas, the method herein described of reducing standpipe stoppage, consisting in discharging gas simultaneously from a plurality of generating retorts directly and through relatively short lateral paths into a vertical path, said vertical path being formed by a standpipe and common to all the retorts, and timing the charging with coal of each retort relatively to the charging of all the other retorts to maintain the temperature of said verticle path substantially uniform.

"3. In the manufacture of coal gas, the method herein described of reducing standpipe stoppage, consisting in discharging gas from a plurality of generating retorts directly and in lateral direction into a vertical path formed by a standpipe and with the gas entering said path at different elevations, and timing the charging of each retort with coal relatively to the charging of every other retort to maintain the temperature of said vertical path substantially uniform.

"4. In the manufacture of coal gas, the method herein described of reducing standpipe stoppage, consisting in charging a group of retorts with coal at different times and thereby creating overlapping carbonization periods, the time of charging each retort of the group being remote from the time of charging the retorts nearest thereto and thereby minimizing variation in temperature of the retorts and of the gaseous output thereof, maintaining direct communication between each retort during its carbonization period and a vertical path with said path formed by a standpipe common to all the retorts, and timing the charging of each retort relatively to the charging of all the other retorts to maintain the temperature of said path substantially uniform.

"5. In the manufacture of coal gas, the method herein described which consists in charging in sequence a plurality of gas generating retorts with coal and retaining the charges within the retorts for corresponding periods of time and thereby maintaining overlapping carbonization periods of corresponding duration for all the retorts, discharging the gas from all the retorts directly into a vertical path with said path inclosed by a standpipe and common to all the retorts, and timing the charging of each retort relatively to the charging of all the other retorts to maintain the composite gaseous stream within said vertical path substantially uniform in quality, temperature and volume.

"6. In the manufacture of coal gas, the method herein described, consisting in discharging gas simultaneously from a plurality of generating retorts directly into a vertical path formed by a standpipe, said path common to all the retorts and proportioned relatively to the latter to forestall back pressure in any retort, and timing the charging with coal of each retort relatively to the charging of all other retorts to maintain a gaseous stream within said path of substantially uniform volume."

It is contended in behalf of the plaintiff that what the defendants did infringed each of these claims except the fourth.

The alleged infringing apparatus contains, besides other features, one or more of which will be mentioned later, several tiers of coal gas generating retorts placed one above the other, and so arranged with reference to standpipes which are parallel with the vertical rows of retorts that each of the retorts in such a vertical row has a connection with the same standpipe through a short lateral conduit or passage-

way, which may be opened or closed as desired by means of a valve set at the retort end of the lateral conduit. The retorts are emptied of the coke made by burning the gases out of the coal and are recharged with coal by a movable machine, which when in operation is in a position opposite to the retort to be emptied and charged, and on a level with it. The practice of the defendants in the use of this machine is to keep it on the same level until all of the retorts on that level have been emptied and charged; the retorts on that level being emptied and charged one after another or successively. Then after a predetermined interval of time the machine is placed on a level with another horizontal tier or row of retorts, which in like manner are emptied and recharged successively. Results of following the schedule adopted by the defendants are that each retort is emptied and recharged at intervals of about eight hours, which is the time required to burn the gas out of coal, and about two hours elapse between the emptying and recharging of any two retorts which are in the same vertical row. When a retort is to be emptied and charged, the connection between it and the standpipe is cut off by means of the valve above mentioned, the lateral passageway is cleaned out, and such passageway is kept closed while the retort is being emptied of coke and recharged with coal.

The defendants profess not to rely upon this method of emptying and recharging retorts to lessen or get rid of standpipe stoppage. This result they claim to accomplish by the use of water so applied as to flow down the sides of the standpipe, a thin film of water moving down the inside of the pipe being the means of carrying to a receptacle below the retort to which the standpipe leads substances thrown off from the gas in its passage through the standpipe. But it is insisted in behalf of the plaintiff that the defendants' addition of the use of water cannot be given the effect of entitling them to follow the rotational method of charging which is described in the claims of the process patent in suit, and that what the defendants do includes a method or process which is described in one or more of the claims of that patent. The opinion of Judge Newman shows that what occurred in the Patent Office, as disclosed by the "file wrapper," between the date of the original application and the issue of the process patent, led him to the conclusion that that patent was not meant to confer on the patentees the right to prevent the use by others of such a method of charging a number of coal gas generating retorts having connection with a common standpipe, as was used in the operation of the alleged infringing apparatus. The writer has not been convinced that this conclusion is a tenable one. But the result is the same if that patent was ineffective to confer that right on the patentees or their assigns.

Each of the steps taken in the operation of the alleged infringing apparatus, the taking of which in conjunction is claimed to constitute an infringement of the plaintiff's process patent, was old in the coal gas making art when that patent was applied for. There was no novelty in discharging gas from several retorts into one standpipe, though the common practice was for each retort to have its own standpipe. A valve mechanism used to stop at will the discharge of

gas from one or more retorts into a common standpipe was an old device. The way the defendants used a machine to empty and recharge retorts was one that had been in vogue for many years. And there was no novelty in the scheme of charging successively at stated intervals retorts the gases from which pass into a common receptacle, so that the gases from the different retorts reach the common receptacle at different stages of the burning of the coal from which they were generated. In 1878 there was issued to Joseph Slade United States patent No. 8,422, the single claim of which was as follows:

"In the manufacture of illuminating gas, using the ordinary bench of retorts, the mode of preventing loss of heat at the time when the coal is throwing off gas the fastest, which consists in charging the retorts in each bench successively at stated intervals; the retort undergoing the operation of charging being the one farthest removed from the retort or retorts last charged."

The Slade patent does not mention or describe the receptacle in which gases discharged from different retorts come together and mingle, and it says nothing about using the method of equalizing temperature which it describes for the purpose of reducing stoppages in a standpipe which serves several retorts. But that patent makes it plain that, long before the plaintiff's assignors claimed to have discovered the method of reducing standpipe stoppage which the claims of their process patent describe, there had been disclosed in the gas making art a method of affecting the condition of the gas in a receptacle containing what comes from a plurality of retorts by charging such retorts successively and at stated intervals. And the evidence makes it equally plain that long prior to the date of that alleged discovery a standpipe serving a plurality of retorts was known and used as a receptacle for the gas discharged from such retorts. The use of the Slade rotational method of charging to affect the condition of gas in a standpipe which serves several retorts is the use of an old process to affect the condition of gas in a gas receptacle of an old type. Nothing in the Slade patent indicates an intention to limit the application of the process it describes to a receptacle containing gas which had already passed through a standpipe. The method it describes is applicable to any receptacle containing the gas discharged from a plurality of retorts. A standpipe serving several retorts is such a receptacle. The relation between a standpipe and the part of the gas making apparatus or plant into which gas goes when it leaves the standpipe is by no means a remote or obscure one. To a person familiar with the operation of gas making machinery and skilled in that business it must be quite obvious that a method of charging retorts which is affective on the temperature or other condition of the gas in a receptacle into which a number of standpipes discharge would, if applied in the charging of a number of retorts served by a common standpipe, be similarly affective on the temperature or other condition of the gas while in such standpipe. One who was aware of the disclosure made by the Slade patent and of the previous existence of the device of a single standpipe serving several retorts—and a subsequent patentee is chargeable with such knowledge whether he actually possessed it or

not—could not be entitled to a patent giving him a monopoly of the use of the Slade rotational method in charging a plurality of retorts which are served by a common standpipe, unless such an application of a previously known method or process involved the exercise of the inventive faculty as distinguished from mere mechanical skill. If the plaintiff's assignors were the first to use the Slade rotational method in charging retorts served by a common standpipe, this amounted only to putting an old process to a use quite similar and closely analogous to a previously disclosed use of that process.

We do not think that there is any substantial difference between the methods of charging retorts which are described in the claims of the process patent in suit, which the plaintiff contends have been infringed by the defendants, and the method of charging described in the Slade patent. In view of the state the gas making art had reached prior to the time the process patent in suit was applied for, the most that properly can be said of that patent is that it evidences the discovery that the use of a previously known method of charging retorts is effective in reducing stoppages in a standpipe into which the gas from all such retorts is discharged and in forestalling back pressure. In other words, the discovery was that an old process applied in a way quite cognate and similar to a previously known way of applying it in the same industry had a beneficial operation or effect not previously made known. Both the method of charging described in the claims of the process patent which it is contended have been infringed and the gas receptacle with reference to which that method was proposed to be applied were old in the gas making industry. Nothing was new, except the purpose for which that old method was so applied. This was not enough to entitle the patentees to a monopoly of the use of that old method. Such a new and analogous use to which an old process is put does not amount to a patentable invention. Potts v. Creager, 155 U. S. 597, 606, 15 Sup. Ct. 194, 39 L. Ed. 275; Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856; Baker v. F. A. Duncombe Mfg. Co., 146 Fed. 744, 77 C. C. A. 234; Walker on Patents (5th Ed.) §§ 38, 39.

The conclusion is that the claims of the process patent which are brought into question, namely, the first, second, third, fifth, and sixth claims, are not sustainable.

We concur in the conclusions reached by the District Judge in regard to the valve patent and the standpipe patent, and do not deem it necessary to add anything to what he said in his opinion with reference to those patents.

The decree appealed from is affirmed.

BATTS, Circuit Judge (concurring). In coal gas making, by connecting a standpipe between two vertical rows of horizontal retorts with each retort (patent No. 1,091,111) by a lateral pipe with a valve in the retort (patent No. 1,122,683) and (patent No. 1,140,113) charging the retorts at such intervals as maintained in each a degree of carbonization different from the others, complainants claim to have accomplished ease in removing lampblack from the connecting pipe,

and an equality of temperature, obviating the deposit of tar, lamp-black, and pitch, removal of which, under the old system of retorts with separate standpipes, was troublesome and expensive.

Defendant is charged with infringement in the operation of a plant with like rows of retorts connected on one side of a standpipe by a pipe and a valve in the standpipe, in which water is kept flowing down the interior of its sides; the charging being sequently done with a machine which is moved at regular intervals from one to another of the horizontal rows into which retorts of the vertical rows of corresponding height are disposed. It was claimed that the water jacket obviated the deposit, and that the location of the valve in the standpipe rendered cleaning the connecting pipe easier.

The use of a single standpipe for several retorts, if ever patentable, was anticipated by United States patents: Rowland, 211,591; Fowler, 808,831; Taussig, 694,443—and English patents: Wates, 5,513; Hanson, 8,880; and Scoble, 421. The use of a lateral pipe and valve to connect the retort and standpipe involved nothing novel, and was anticipated by patents: Rowland, 211,591; and Wates, 5,513. Regulating intervals between chargings of retorts would not seem to be more patentable than a schedule for trains, or meals or medicine. The method was anticipated by Slade, 4,422.

If the patent were valid, it was not infringed. At most, it involved a method by which standpipe stoppage was reduced, if conditions (including an enlarged pipe) were as at complainants' plant. Defendant continued, after patent, a manner, in substantial accord with complainants' method, of using a charging machine. The manner of use was customary, and not to produce results claimed by patentees. The essential conditions were evidently absent, for the results did not follow.

For the reasons indicated by the trial judge, and because complainants' method patent is void, the judgment should be affirmed.